**LAW OFFICES OF RAHUL WANCHOO** (RW-8725)
Attorneys For Plaintiff
Empire State Building
350 Fifth Avenue, Suite 3304
New York, New York 10118
Phone: (201) 882-0303
Fax:    (201) 301-3576
E-mail: rwanchoo@wanchoolaw.com


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

WORLD REACH SHIPPING LIMITED                    ECF CASE

              Plaintiff,                    07 CV 8449 (___)

    - against -                                        **VERIFIED COMPLAINT**

HANJIN SHIPPING CO. LTD.

              Defendant.

------------------------------------------------------------X


      Plaintiff, WORLD REACH SHIPPING LIMITED ("World Reach"), by its attorney,

LAW OFFICES OF RAHUL WANCHOO, alleges on information and belief as follows:

## JURISDICTION AND VENUE

      1.      This is a case of admiralty and maritime jurisdiction within the meaning of Rule

9(h) of the Federal Rules of Civil Procedure, and within the admiralty and maritime jurisdiction

of the United States and of this Honorable Court. This case also falls under the Court's admiralty

and maritime jurisdiction pursuant to 28 U.S.C. §1333. Finally, this Court also has jurisdiction

over this matter because the action also arises under the convention on the Recognition and

Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et. seq.* and/or the Federal

Arbitration Act, 9 U.S.C. §1 *et. seq.*

2.      At all material times, Plaintiff, World Reach was and now is a foreign corporation organized under and existing by virtue of the laws of the Republic of Liberia, and is the owner of the M.V. FALCON TRADER (the "Vessel"), a bulk carrier of about 26,446 deadweight tons capacity engaged in the carriage of bulk cargo by water.

3.      Upon information and belief, at all material times, Defendant, HANJIN SHIPPING CO. LTD. ("Hanjin"), was and is a foreign corporation organized and existing under and by virtue of the laws of the Republic of Korea, and was the charterer of the Vessel.

## FACTS GIVING RISE TO CLAIM

4.      On or about November 29, 2005, a time charter party (the "Charter") was made between World Reach, as owner of the Vessel, and Hanjin as charterer whereby Defendant chartered the Vessel for the carriage of steel cargo for one time charter trip for a period of about 15/20 days from safe ports in China and Korea for delivery at Cardiff, Newport and Immingham, United Kingdom. A true and accurate copy of the Charter is annexed hereto as Exhibit 1.

5.      The Charter provided that owner to authorize the charterer to sign original bills of lading always in accordance with mate's receipt in which case charterer to indemnify owner against all consequences and liabilities arising by charterer signing bills of lading on owner's behalf. The Charter also provided that charterer is to load, stow, trim and discharge the cargo at its expense under the supervision of the Captain.

6.      Pursuant to the Charter, the Vessel loaded its cargo of steel at China and Korea. Upon completion of loading Hanjin issued one set of original bills of lading for the cargo loaded on board the Vessel. However, on arrival at the discharge port Plaintiff was presented with a second set of bills of lading issued by the Defendant which differed in important details from the "first" set of bills of lading issued at the loading port. Significantly, the second set of bills of

2

lading required Plaintiff to deliver the cargo to consignees who were not named in the first set of bills of lading. Delivering the cargo to the wrong consignee would have exposed Plaintiff to liabilities to the actual owner of the cargo. In the circumstances and in consideration of Plaintiff delivering the cargo to the consignees named in the second set of bills of lading Defendant provided Plaintiff with a letter of indemnity undertaking to indemnify Plaintiff in respect of all "losses, liabilities, costs and expenses of any whatsoever arising out of the delivery and/or delay in delivery of said cargo." True and accurate copies of the letters of indemnity dated March 2 and 5, 2007 are annexed hereto as Exhibit 2.

7.      By reason of Defendant's issuance of two sets of bills of lading Plaintiff has incurred the following costs and expenses in delivery of the said cargo:

|  |  |
|---|---|
| (a) Warehouse Fees incurred at Cardiff and Newport (Exhibit 3) | GBP 6,740.80 |
| (b) Warehouse Fees incurred at Immingham (Exhibit 4) | GBP 3,256.00 |
| (c) Rayfield Mills Legal Fees (Exhibit 5) | GBP 1,273.00 |
| | GBP 11,269.80 |
| Subtotal | $23,050.12[1] |

8.      Plaintiff has also incurred survey fees in the amount of $17,377.48 (GBP 8,496.30) in relation to damage caused to the steel cargo as a result of poor stowage. (Exhibit 6). Defendant provided a letter of guarantee that it would bear responsibility for cargo damage caused by bad stowage. A true and accurate copy of the letter of guarantee is annexed hereto as Exhibit 7.

9.      Pursuant to the terms of the Charter and the letters of indemnity and/or guarantee, Defendant should have paid the costs and expenses incurred by Plaintiff in delivery of the cargo due to the issuance of the two sets of bills of lading in the amount of $23,050.12 and the survey fees for damage caused by bad stowage in the amount of $17,377.48.  However, despite various reminders from Plaintiff to Defendant, no payment has been received to date.

---

[1] 1 GBP = $2.0453

3

9.     By reasons of the premises, Plaintiff has sustained damages in the amount of $40,427.60 as best as can presently be calculated.

10.     The Charter also provided in that, if any dispute arises between the parties, the matter in dispute shall be referred to arbitration in London with English law.  In addition to the unpaid discharge costs and survey fees, Plaintiff is also entitled, in London, to attorneys' fees and other taxable costs incurred or likely to be incurred in bringing this claim, which as best as can presently be calculated, are $35,000.

11.     Arbitration of these disputes in London under the small claims procedure may take one year.  Plaintiff is entitled to and would receive interest at the present rate of 7.5% compounded monthly from April 2007 to the completion of the arbitration or about $4,528.

12.     Plaintiff's total claim against Defendant for which it seeks security herein is $79,955.60.

13.     All and singular the premises are true and within the admiralty and maritime jurisdiction of this Honorable Court.

14.     Plaintiff brings this action by seeking an order of seizure of Defendant's goods and chattels, or credits and effects in the hands of garnishees to be named in the process, in the amount sued for herein, so that the Court shall have jurisdiction to direct Defendant to proceed with arbitration of Plaintiff's claim against Defendant and to retain jurisdiction to enter a judgment upon the arbitration award in the London arbitration.

4

**WHEREFORE,** the Plaintiff prays the following:

1.    That process in due form of law according to the practice of this Court in causes of admiralty and maritime jurisdiction may issue against Defendant, Hanjin Shipping Co. Ltd., and that it be personally cited to appear and answer the matters set forth above.

2.    That if the Defendant cannot be found within this District, then that Defendant's goods and chattels, or credits and effects within the hands of garnishees within the jurisdiction of this Court be attached by process pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure, Supplemental Rules for Certain Admiralty and Maritime Claims and in an amount sufficient to answer Plaintiff's claims of $79,955.60, the sum sued for in this Complaint;

3.    That the action thereafter be stayed pending the arbitration award and that a judgment be entered upon the award of the aforesaid arbitration for the amount of any recovery by Plaintiff, together with interest, costs and disbursements of this action; and

4.    That this Court grants to Plaintiff such other and further relief as may be just and proper in the circumstances.

Dated: New York, New York
September 28, 2007

> **LAW OFFICES OF RAHUL WANCHOO**
> Attorneys for Plaintiff
> WORLD REACH SHIPPING LTD.
>
> By: _Rahul Wanchoo_
> Rahul Wanchoo (RW-8725)

5

STATE OF NEW JERSEY)

                       ss.

COUNTY OF BERGEN   )

      I,  Rahul Wanchoo, being duly sworn, deposes and says:

      I am an attorney at law and a member of the firm of Law Offices of Rahul Wanchoo, attorneys for Plaintiff.

      I have read the foregoing Verified Complaint and know the contents thereof and the same are true to the best of my knowledge, information and belief.

      The reason that this verification is made by me and not by Plaintiff is that Plaintiff is a foreign corporation and is not within this District.

_____Rahul Wanchoo_____

Sworn to and subscribed to
before me this 18th day of
September 27, 2007

_____

    Notary Public

LILA CHIN
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES FEB. 18, 2012

*Exhibit 1*

# Time Charter

**GOVERNMENT FORM**

*Approved by the New York Produce Exchange*

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party,** made and concluded in _____ Seoul _____ 29th _____ day of _____ November, _____ 19 2005

2  Between **WORLD REACH SHIPPING LIMITED.,** Monrovia

3  Owners of the good _____ Steamship/Motorship _____ *"FALCON TRADER"* _____ of *(description See Clause 29)*

4  of _____ tons gross register, and _____ tons net register, having engines of _____ indicated horse power

5  and with hull, machinery and equipment in a thoroughly efficient state, and classed _____

6  at _____ of about _____ cubic feet bale capacity, and about _____ tons of 2240 lbs.

7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8  allowing a minimum of fifty tons) on a draft of _____ feet _____ inches on _____ Summer freeboard, inclusive of permanent bunkers,

9  which are of the capacity of about _____ tons of fuel, and capable of steaming, fully laden, under good weather

10  conditions about _____ knots on a consumption of about _____ tons of best Welsh coal—best grade fuel oil—best grade Diesel oil,

11  now _____

12  _____ and _____ **HANJIN SHIPPING CO., LTD.** _____ Charterers of the City of *Seoul, Korea*

13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about *one time charter via safe port(s), safe berth(s), safe anchorage(s), always accessible, always afloat, always within Institute*

15  *Warranty Limits to Australia with cement clinker, duration about 15/20 days without guarantee* within below mentioned trading limits.

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*

18  Vessel to be placed at the disposal of the Charterers, *at on dropping last outward sea pilot Chiba, Japan, any time day or night, Sundays and*

19  *holidays included.*

20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be

22  ready to receive cargo with clean-swept holds *washed down, dry, fit and safe for the reception, carriage and preservation of any permissible*

   *cargo (See Clause 29)* and tight, staunch, strong and in every way fitted for the service, *and so maintained by the Owners throughout the*

   *currency of this Charter Party* having water ballast *and with sufficient power to operate all hatches and winches simultaneously,* winches and

23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24  time (and with full complement of officers, *and crew* seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25  dise, including petroleum or its products, in proper containers, excluding See Clause 30 _____

26  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29  Mexico, and/or South America *and places within British Institute Warranty Limits (See also Clause 31)* _____ and/or Europe

30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31  October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

32  _____



33
34
35  as the Charterers or their Agents shall direct, on the following conditions:
36      1.    That the Owners shall provide and pay for all provisions, wages and *charges for port services pertaining to crew and to the Owners'
      *business including immigration, fines, garbage charge* consular shipping and discharging fees of the Crew; shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, *lubricating oil and fresh water (excluding additional
      fresh water for holds cleaning when vessel's own stock insufficient)* including boiler water and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.
39      2.    That the Charterers *whilst on hire* shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory* Pilotages,
      *boatage on Charterers' business,* Agencies, Commissions,
40  Consular Charges (except those pertaining to *individual crew members or flag of the vessel* the Crew), and all other usual expenses except those
      before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43  charter to be for Charterers account *any time*. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  of six months or more.
45      Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47  for dunnage, they making good any damage thereto.
48      3.    That the Charterers, at the *pilot port* of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel, *and diesel oil*
      *remaining on*
49  board the vessel *according to prices and quantities as per Clause 33* at the current prices in the respective ports, the vessel to be delivered with not
      less than_____-tons and not more than
50  _____tons and to be re-delivered with not less than_____-tons and not more than_____-tons.
51      4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD10,750 daily including overtime*
52  _____ United States Currency per day ton on vessel's total deadweight carrying capacity, including bunkers and
53  stores, on_____-summer freeboard, per Calendar Month, commencing on and from the *time of the* day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a *day* month; hire to continue until the *time hour* of the day of her re-delivery in like good order and condition,
      ordinary
55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot 1 safe port North Australia, port in Charterers' option*
56  *any time day or night, Sundays and holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than *serve 15/10*
      days *approximately and 7/3/1 day(s) notice of redelivery*
57  notice to Owners of vessels expected date of re-delivery, and probable port.
58      5.    Payment of said hire to be made in New York in cash in United States Currency, *15 days* semi-monthly in advance, and for the last half month
      or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day-by-day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers *but subject to the notification procedure as per
      Clause 32.* Time to count from 7 a.m. on the working day
63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64  to have the privilege of using vessel at once, such time used to count as hire *See Clause 92.*
65      Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2-1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances. *In the event that Master requests delivery of cash money at the vessel, all risks and expenses involved arranging and
      making such delivery of cash money to the vessel shall be borne by the Owners.*

68     6.   That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may
69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
70 lie aground. *(as per Clause 31)*
71     7.   That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel, furniture, provisions, stores and fuel. *See Clause 30* ~~Charterers have the privilege of passengers as far as accommodations allow,~~
74 ~~Charterers~~
~~paying Owners _____ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
75 ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~
76     8.   That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78 agency, and Charterers are to load, stow, and trim, *and discharge the cargo at their expense under the supervision of the Captain, who is to sign Bills of
Lading for
79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts. (See also Clause 62)*
80     9.   That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81 receiving particulars of the complaint, investigate the same, and *requested by Charterers*, if necessary, make a change in the appointments.
82     10.   That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84 rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85 Clerks, Stevedore's Foreman, etc., Charterers paying *as per Clause 37* – at the current rate per meal, for all such victualling.
86     11.   That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87 Captain shall keep a full and correct *deck and engine Log* of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish
the Char-
88 terers, their Agents or Supercargo, when required, with a true *and free copy in English* of such daily *deck and engine Logs*, showing the course of
89 the vessel and distance run and the con-
sumption of fuel *etc as per Charterers' form.*
90     12.   That the Captain shall use diligence in caring for the ventilation of the cargo.
91     13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~
92 ~~_____~~
93 ~~on giving written notice thereof to the Owners or their Agents _____ days previous to the expiration of the first named term, or any declared option.~~
94     14.   That if required by Charterers, time not to commence before _____ *0801 hours 03rd December, 2005* _____ and should vessel
95 not have given written notice of readiness on or before _____ *1200 hours 07th December, 2005* _____ but not later than 4 pm, Charterers or
96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Voyage order(s) given do not waive
Charterers' option of cancelling.*
97     15.   That in the event of the loss of time from deficiency *and/or default by men including strikes, sabotage of Officers and crew whether
98 due to labour disputes or otherwise, or deficiency* of men or stores, fire, breakdown or damages to hull, machinery or equipment,
grounding, desertion by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99 whatsoever
preventing the full working of the vessel, the payment of hire *and overtime, if any* shall cease for the time thereby lost; *until the vessel has returned
to equivalent position and all extra expenses sustained by the aforementioned causes to be for Owners' account and shall deductible
from the hire and if upon the voyage the speed be reduced by reason other than adverse weather conditions and current
100 defect* in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire. *Any stevedore and/or labour charges for breakdown of vessel's equipment not
caused by Charterers to be for Owners' account.*
102     16.   That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105    The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106    purpose of saving life and property.

107    17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *arbitration in London.* three persons at New York;
108    one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109    the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. *(See Clause 59)*

110    18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-time charter hire* for any amounts due under this Charter, including General Aver-
111    age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112    deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113    might have priority over the title and interest of the owners in the vessel.

114    19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115    Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116    York-Antwerp Rules 1974 *as amended 1990* 1924, at *London, but Owners respecting Charterers'* sub-contract *stipulation as long confined*
*to recognised place of adjustment* such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these
117    Rules, according to the laws and usages at the port of New York. In each adjustment disbursements in foreign currencies shall be exchanged into
118    United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119    the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120    bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121    or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122    required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123    carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124    place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125    United States money. *The word "carrier" in this Clause refers to the Owners of the vessel. Time-Charter shall not contribute to General Average.*

126    In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,
127    whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the
128    goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129    losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130    goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131    ships belonged to strangers.

132    Provisions as to General Average in accordance with the above *as well as the New Jason Clause attached* are to be included in all bills of lading issued hereunder.

133    20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134    cost of *bunkers consumed to be calculated at same price as on delivery* replacing same, to be *for Owners' account* allowed by Owners.

135    21. That so the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136    convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137    time of last painting, and payment of the hire to be suspended until she is again in proper state for the service. *(See Clause 38)*

138    ————————————————————————————————————————————————————————————

139

140    22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also
141    providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142    same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient lights and power*
*simultaneously work in all holds and deck free of charge to Charterers if required* lanterns and oil for
143    night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144    Charterers to have the use of any gear on board the vessel.

145    23. Vessel to work night and day *and on sundays and holidays,* if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;

146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~
151 ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~
155                                       U. S. A. Clause Paramount (See also Clause 69)
156      This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159 be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
160                                       Both-to-Blame Collision Clause (as attached)
161 ~~If the ship owner into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carries.~~
167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging.
170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.
172 27. A commission of 1.25 2-1/2 per cent is payable by the Vessel and Owners to *Compass Shipping Co., Ltd., Seoul, Korea*
173 *and 1.25 percent to Howe Robinson & Co., Ltd., London* _____
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28.  An address commission of 2 1/2 per cent payable to _____*Charterers*_____ on the hire earned and paid under this Charter.

*Clause 29 to 116, inclusive as attached are deemed to fully incorporated in this Charter Party.*

**CHARTERERS :**                                       **ONWERS :**

RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
CHARTER PARTY DATED 29TH NOVEMBER, 2005

Clause 29.

M.V. "FALCON TRADER"
============

- Log Bulk Carrier.
- Built 1993 Febr. Japan.        Flag : Liberia    Class : NK.
- GRT/NRT 15,884/8,992
- DWT :        26,446 on 9.542 M (Summer).
               25,708 on 9.344 M (Winter).
- 4 x 30 Mts Cranes.
- TPC 37.76 Mts.
- Loa / Beam : 167.20 M/26 M.
- Depth : 13.30 M
- 5 Holds/5 Hatches 30 Mts x 4 Cranes (Fukushima) Macgregor.
- Constant 230 Mts.
- Total Grain/Bale : 1,197,792/1,154,141

| | | |
|---|---|---|
| Hold I | 168,725/12,019 | cuft gr/bl. |
| Hold II | 262,781/253,577 | cuft gr/bl. |
| Hold III | 263,002/254,623 | cuft gr/bl. |
| Hold IV | 268,199/254,623 | cuft gr/bl. |
| Hold V | 235,085/229,917 | cuft gr/bl. |

- hatchcover Dimensions :        H 1            13.85 x 13.05 Mtrs
                                  H II/III/IV/V   19.25 x 13.05 Mtrs
- Free Floor dimensions :
    Hold I      21.55 x 17.50 – 4.50 Mtrs
    Hold II/III/IV   25.95 x 17.50 Mtrs
    Hold V      25.18 x 17.50 – 7.30 Mtrs
- WLTHC 9.07 Mtrs in SW/8.90 Mtrs in FW.
- Slewing Speed – 0.75 RPM/Hoisting Speed 30 Mts – 18.5 Mtrs/Min.
    13 Mts – 37 Mtrs/Min.
     6 Mts – 55.5 Mtrs/Min.
    Empty – 58 mtrs/Min.
- WWF Hold ladder in order.
- Strength of Hatch Cover : on weather deck : No. 1        2.50 MT/M2.
- No. 2/5        3.00 MT/M2.
- Strength Upper Deck 4.00 Mts.
- Tanktop strength        : 18 Mts/M2. (Local Strength).
                           : 11.285 Mts/M2. (0.925 x 12.20) (Uniform Load).

1

RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
CHARTER PARTY DATED 29TH NOVEMBER, 2005

– Suez GT/NT 16888.06 / 14923.97

– Panama GT/NT 17211.28 / 12909.32

– Official Nr : 11487.

– IMO : 9047001

– Lashing Materials on board.

– Holds CO2 fitted

– Height of Stanchions 7.3 Mtrs.

– IFO Capacity 100 Oct 1180 cbm/mdo – 189 cbm

– Speed/Consumption :

abt 13.5/13 Knots on 21/19 M/T h레 (380 ifo cst)

Smooth Weather Condtions.

In port full use cranes abt 3 Mts (380 cst) + ABT 0.2 MT MDO/per day.

ifo 380 = iso 8217 / RMG 35, MDO = iso 8217 / DMB.

– Call sign : ELZO8

– Satcom C : 463694156

– Owners : World Reach Shipping Limited., Monrovia.

– Technical & Commercial managers : J Bekkers Co B.V., Rotterdam

– PandI : North of English.


All dets abt. And believed to be correct.


– PORT/DATE OF LAST/NEXT DRY DOCK SEP 2003/AUG 2007
   DATE OF LAST/NEXT SPECIAL SURVEY      "          "

– PORT/DATE OF LAST 'AMSA OR PORT STATE CONTROL'
   INSPECTION WITH RESULTS PARADIP 19 NOV 2005 NO DEFICIENCIES

– VSLS P AND I CLUB NORTH OF ENGLAND
   INSURED VALUE OF H+M WITH NAME OF UNDERWRITERS 17.25 MILL

– MASTER'S NATIONALITY/NAME SERGEY LOYUK UKRAAINE
   CREW NATIONALITY/NBR UKRAINE 20

– VSLS LAST FOUR (4) CGOES WITH EACH LOAD/DISCHPOR(S)
   CHROME CONS PARADIP/CHIBA/HBI P.ORDAZ/BOMBAY/BULK CEMENT
   HOPING/BALTIMORE INGOTS AUSTRALIA/TAIWAN

– VSLS LATEST FULL ITIN WITH FULL STYLE OF AGTS AT DISPORT
   ETA URAGA/CHIBA 0001 30TH BERTH 3RRD ETS 4TH ETA KANDA 6TH
   AGENTS CHIBA MARINE 81 43 261 3361

– crane outreach 9 mtr


2

RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
CHARTER PARTY DATED 29TH NOVEMBER, 2005

- bankers

> H.B.U. Bank.
> Coolsingel 104
> 3011 AG Rotterdam.
> Netherlands
> Swift Code : HBUANL2R.
> Beneficiary : Delta Carriers S.A.
> Account Nr. : 49.29.86.800
> Code MT103

## Clause 30. CARGO EXCLUSIONS

Charterers have option to load intended cargo on deck/hatch cover at Charterers' risk and expense
in accordance with vessel's deck/hatch cover strength at master's discretion.   All Bill(s) of Lading
issued for such cargo to be claused 'carried on deck at shipper's risk and expense'.

The following cargo exclusions are mutually agreed upon :

Acids, Ammonia Nitrates, Ammunition Aggregates, Alumnia, Arms, Asphalt, Borax, Calcium Carbide.
Calcium Hydroxide, Calcium Hydrochloride, Cement, Charcoal, Concentrates, Corpa, Cotton,
creosoted goods, direct reduced Iron, Expellers, Explosives (including Black Powder, Blasting Caps,
Dynamite, TNT, Foreworks, etc.), Expartograss, Ferrosilicon, Hides, hot briquetted Iron, Livestock,
Meals, (Fishmeal, Meatmeal, Soya Bean Meal, Speed Meals, Bon Meals, etc), Mineral Sands, Motor
Blocks, Motor Sprit, Naptha, Newsprint, Nuclear and or Radio Active materials and Wast, Palm
Kemal Extraction, Petroleum and ITS Products, Petcoke, Pitch Pyrites, Resin, Salt, Scraps, Seeds
Cakes, Soda Ash, Sponge Iron, Sulphur, Sunflower Seeds Tar, Turning, Turpentine.

But Owners allow Charterers to carry during the Charter Party.
Maximum one cargo of Soya Bean Meal.
Maximum one cargo of petcoke.

## Clause 31. TRADING LIMITS

Always afloat (except NAABSA in South America only, see Clause 6) always via safe ports, safe
places, worldwide trading within Institute Warranty Limits, excluding Finland, Sweden, Norway,
Denmark, Algeria, Israel, Lebanon, Syria, Iran, Iraq, Somalia, Ethiopia, Yemen, Angola, Liberia,
Nigeria, Cuba, Vietnam, Cambodia, Pacific Russia, Albania and Irian Jaya.
Charterers guarantee the vessel not to trade directly between People's Republic of China and

3

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
## CHARTER PARTY DATED 29TH NOVEMBER, 2005

Taiwan or vice versa trading always within Institute Warranty Limits, but Charterers have the option to trade beyond Institute Warranty Limits subject to Owners' and their underwriters' prior consent but not to be unreasonably withheld, against paying to Owners additional Insurance Premium on Hull and Machinery as per vouchers from vessel's Underwriters, but such additional premium not to exceed the amount charged if vessel had been insured by Lloyds in London.

### Clause 32. HIRE PAYMENTS

1st hire to be paid within 3 banking days after vessels delivery and Charterers receipt of original/signed by e-mail Charter Party in Seoul.

For hire calculation purpose, time of delivery/redelivery to be based on GMT.

Hire to be paid to Owners bank account as follows :

H.B.U. Bank.
Coolsingel 104
3011 AG Rotterdam.
Netherlands
Swift Code : HBUANL2R.
Beneficiary : Delta Carriers S.A.
Account Nr. : 49.29.86.800
Code MT103

Referring to lines 60 and 62 : In default of prompt payment of the hire, or bank guarantee or deposit, or on any breach of this Charter, the Owners shall notify the Charterers, whereupon Charterers shall rectify matters within three banking days of receipt of notification from Owners, failing which Owners shall have the right to withdraw the vessel from the service of Charterers, without prejudice to any claim the Owners may otherwise have on Charterers under this Charter.

### Deduction from hire

Charterers have the option to deduct the address commission and Charteers brokers commission from the hire, Charterers have the right to withhold from Charter hire during the period of this Charter such payments due to them for off-hire and Owners' disbursements. Charterers are to pay value of estimated consumptions with 1st hire. And entitled to deduct estimated consumptions and estimated Owners expenses but maximum USD1,000 per port, from last sufficient hire payments. If amount justified to be deducted exceeds value of 15 days hire, then from last two semi monthly payments to apply. Final settlement to be made soonest possible after redelivery.

### Clause 33. BUNKERS

Charterers to pay for estimated consumption for the trip together with 1st hire payment vessel to

4

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
## CHARTER PARTY DATED 29TH NOVEMBER, 2005

be delivered with about 450/500 MT IFO and about 37/42 MT MDO vessel to be redelivered with
about same quantity as on delivery same prices both ends USD305 PMT IFO/USD575.00 PMT MDO.

IFO 380 = ISO 8217 : 1987 RMG 35 Density max 0.991
IFO 180 = ISO 8217 : 1987 RME 25
MDO     = ISO 8217 DMB

Charterers have option to supply their bunkers prior to delivery provised the same does not
interfere with vessels operations.

Clause 34.
Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto
supplied with up to date and complete certificates and approvals enabling the vessel and her crew
to carry the cargoes and trade within the trading limits allowed throughout this Charter Party.

Owners warrant that at the date of delivery and throughout the currency of this Charter vessel shall
be of the description set out in lines 3 through 10 and Clause 29 and undertake that whenever her
hull, machinery and/or equipment is not thoroughly efficient, they will immediately take all
necessary steps to put her condition right again. All the cots/expenses/time to be for Owners'
account.

Clause 35. ON-OFF HIRE SURVEY
Joint bunkers and condition on-hire survey to be held on delivery or at first loading port in Owners'
time by an independent sworn surveyor for both parties to be mutually agreed. Joint bunkers and
condition off-hire survey to b held on redelivery in Charterers' time by an Independent sworn
surveyor for both parties to be mutually agreed. The expense for both parties to be equally
shared.

Clause 36. OFF-HIRE/DURATION OF CHARTER PARTY
Charterers have the option of adding any or all time the vessel "off-hire" to the maximum Charter
period.  Such declaration to be made 10 days prior to the first notice of redelivery.

Should vessel be off-hire for a continuous period of more than 45 days, Charterers have the option
of canceling the Charter.
Clause 37. Deleted.

Clause 38. DURATION OF DRY DOCKING AND REPAIR

5

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
## CHARTER PARTY DATED 29TH NOVEMBER, 2005

No dry docking during this Charter, except for cases of emergency and except for scheduled drydock.

### Clause 39.

Any liability to third parties for cargo claims shall be borne by Owners/Charterers in accordance with Interclub NYPE Agreement dated February 20th, 1970 and reprints of May 1984 or any subsequent modification or replacement thereof. The party having paid the claim shall submit same to the other party with supporting documents as soon as possible.

### Clause 40. HOUSE FLAG CLAUSE

After delivery, Charterers' option to use their own funnel marking, bow marking and colour of deck, hull and superstructure at Charterers' risk/time/expenses and Charteers shall have the option of flaying their house flag during the currency of this Charter, vessel shall be redelivered with Owners' clours. Repainting before redelivery shall be for Charterers' account and time shall count.

### Clause 41. DOUBLE BANKING CLAUSE

BIMCO Standard double banking clause to be incorporated in this Charter Party.

### Clause 42. STEVEDORE DAMAGE

Stevedores to be appointed and paid by the Charterers/Shippers/Receiver but to work under the supervision of the Master, should any damage be caused to the vessel or her fittings by the stevedores, the master has to try to let stevedores repair such damage and try to settle the matter directly with them at the first stage. If stevedores cannot repair the damage or stevedores refuse to repair the same. Master has to endeavour to obtain written acknowledgement of the damages liability from stevedores. In case of any stevedore damage cannot be direct settled between Owners and parties should be responsible for them Charterers should be final responsible for alleged stevedore damage.

Master is required to inform Charterers within 24 hours when stevedore damage incurred.

### Clause 43. WAR RISK INSURNCE AND CREW WAR BONUS

Present war risk and crew war bonus to be for Owners' account. In the event Charterers employ the vessel is a trade for which there is an additional war risk insurance premium, Charterers to reimburse the Owners such additional premium based on vessel insured hull and machinery value at that time, but increase not to exceed with would have been quoted if vessel was covered with Lloyds of London. Charterers to pay for such additional premium on receipt of Owners' invoice accompanied by original vouchers from Underwriters. Any increase in crew war bonus after

6

RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
CHARTER PARTY DATED 29TH NOVEMBER, 2005

delivery caused by the trade in which vessel is engaged to be for Charterers' account.

### Clause 44. HOLD CONDITION

On delivery, vessel's holds to be clean, swept, washed down by fresh water and dried up so as to receive Charterers intended cargo(es) in all respects free of salt.  Rust scale and previous cargo residues to the satisfactions of independent surveyors.

Should the vessel not be approved by the independent surveyors then vessel to be placed off-hire pro rata per hold, if loading operations commenced into passed holds at first, from time of failure until vessel is fully accepted and any directly related and proven additional expenses to be for Owners account.

USD3,000 lump sum excluding removal/disposal of dunnage/lashing materials/etc if any. Owners to instruct Master to accept redelivery of the vessel without holds being cleaned.

### Clause 45. Deleted.

### Clause 46. WAR CANCELLATION CLAUSE

If war or actual hostilities break out between the following countries : U.S.A., C.I.S., U.K., France, Germany, Denmark, Japan, China, both Charterers and Owners shave the option to cancel this Charter.  It is understood that war or actual hostilities means direct war or hostilities between these nations and does not include local hostilities or civil war where any of the above countries support opposing sides.

### Clause 47. STABILITY AND TRIMMING

It is understood that no cargo need to be carried in deep tanks in order to ensure vessel's stability, trim or seaworthiness.  Owners guarantee vessel has sufficient stability and safe trim when trading homogeneously loaded to full capacity and deadweight capacity.

Vessel is self-trimming bulk carrier.  No additional trimming is required to fill all holds up with coal, ore grain, phosphate or similar bulk cargoes.

### Clause 48. NOTICE OF DELIVERY

10/7/5/3/2/1 days delivery notice.

### Clause 49. DEVIATION

A) Should the vessel be put into any port other than those instructed by the Charterers by reason of accident or breakdown or for the purpose of lading any injured or sick officer, the Master or members of the crew, the port charges, pilotages, bunker consumption and other expenses,

7

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
## CHARTER PARTY DATED 29TH NOVEMBER, 2005

including loss of time, shall be borne by Owners, also should the vessel be put back whilst on voyage by any of the above mentioned reasons the hire shall be suspended from the time of her putting back until she is again in the same or equidistant position and the voyage resumed therefrom.

B) Vessel has liberty to deviate for the purpose of saving life and/or property and to two and assist vessel sin distress. Such operation not to be deemed to be a diversion under this Charter Party, but all salvage contribution thus payable to vessel to be equally divided with Charterers after proper deduction of expenses, if any (including Captain and crew's share), incurred in this respect.

### Clause 50. BOYCOTT AND ARREST OF VESSEL

Should the vessel be arrested during the currency of this Charter Party and such arrest is interfering with Charterers' operations, at the suit of any person having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in the respect of any period whilst the vessel is under arrest, provided under the terms of this Charter Party such claims are not Charterers liability and unless vessel performing cargo operations. In the event of vessel being subjected to boycott, being delayed or rendered inoperative by strikes, blacklisting, labour stoppages or any other difficulties arising from vessel's flag, ownership, crew or terms of employment of crew of chartered vessel or any other vessel under the same ownership, operation or control, such time lost is to be considered as off-hire and all expenses incurred thereby, including fuel/diesel consumed during such periods, to be for Owners account and unless vessel performing cargo operations.

### Additional part for Boycott of vessel

In the event of loss of time due to legally justified boycott of the vessel by shore Labour, Linesmen, Pilots and/or Tug-boats or arising from government Restrictions by reason of the terms and conditions of which Captain, Officers and members of the crew are employed, payment of hire shall cease for the time thereby lost and all extra expense directly incurred to be for Owners account. In the event such boycott is unjustified and/or unreasonable Charterers to remain liable for hire payment pending final resolution by competent Court or Tribunal of whether such Boycott is unjustified and/or unreasonable.

Clause 51. Deleted.

### Clause 52. QUARANTINE

The vessel to be in possession of necessary certificate to comply with safety and health regulations and all current requirements at all ports of call under this Charter Party. Normal quarantine time

8

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
### CHARTER PARTY DATED 29TH NOVEMBER, 2005

and expenses to enter ports to be for Charterers account, but any time of detention and expenses for quarantine due to pestilence, illness etc. of the vessel's Master, officers and crew to be for Owners' account, as long as the vessel remains within her trading limits under the present Charter Party.

### Clause 53. SMUGGLING

Charterers to be responsible for any fines whatsoever imposed in the event of smuggling by Charterers' employees, but Owners to be responsible for any such acts of their own officers and/or crew. Charterers to remain responsible for detention of the vessel due to smuggling committed by Charterers' employees only.

### Clause 54. CREW ON BOARD

At loading and discharging port(s) any time lost by the vessel for the reason of not all the crew being on board when the vessel is ready to sail to be for Owners' account, as well as expenses deriving therefrom.

Officers' and crew' overtime, as included in vessel's hire, to include amongst operations usually performed by the crew the following services unless prohibited by shore regulations whether occurring during straight time or overtime.

A) Opening and/or closing of hatches in preparation of loading and/or discharging operations.

B) Assistance during docking and undocking, shifting and bunkering operations.

C) Shaping up hatches as much as possible, weather permitting, prior to arrival at loading and/or discharging port and/or docks and/or places so that loading and/or discharging operations can commence immediately.

D) Supervision during loading and discharging.

E) Charterers to pay USD2,000 for crew work such as erecting/dismantling stanchions, lashing/unlashing/relashing deck cargo, cargo mark-off and setting catwalk provided local regulations/port authorities permit.

Vessel to work day and night without Charterers' special request.

### Clause 56. WATCHMEN

Watchmen for gangway ordered by vessel to be for Owners' account, but if same compulsory by port regulations same to be for Charterers' account. Watchmen for cargo and/or vessel to be for account of party ordering same.

9

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
## CHARTER PARTY DATED 29TH NOVEMBER, 2005

### Clause 57. REPRESENTATION AND COMMUNICATION EXPENSES

Charterers to pay lump sum USD1,200 per months pro rata for all victualling/cable charges/ entertainments/etc.

### Clause 58. U.S. REGULATIONS

If the vessel calls at any U.S. port for purposes of loading or discharging cargo, vessel's equipment shall comply with regulations established by U.S. Public Law 85 742 part 9 (Safety and Health Regulations for Longshoring) or any amendments/new laws pertaining to this.  If longshoremen are not permitted to work due to failure of the master and/or Owners' agents to comply with the aforementioned regulations, any delay resulting therefrom, and any stevedore standby time and other expenses involved, shall be for Owners' account.

### Clause 59. ARBITRATION

All disputes arising out of this Contract shall be arbitrated in London and unless parties agree forthwith on single arbitrator, be referred to the final arbitrament of two arbitrators carrying on business in London who shall be members of the Baltic mercantile and Shipping Exchange and engaged in shipping, one to be appointed by each of the parties, with power to such Arbitrators to appoint an umpire.  No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above unless objection to his action be taken before the award is made.  Any dispute arising hereunder shall be governed by English Law.

For dispute when the total amount claimed by either party does not exceed USD50,000.00 the arbitrations shall be conducted in accordance with Small Claims Procedure of the London Maritime Arbitrators Association.

If either of the appointed arbitrators refuses to act, or is incapable of acting, or dies, the party who appointed him may appoint a new Arbitrator in his place.  If one party fails to appoint an arbitrator, either originally or by way of substitution as aforesaid for thirty clear days after the other party having appointed his arbitrator has served the party making default with notice to make the appointment, the party who has appointed an Arbitrator may appoint that Arbitrator to act an sole Arbitrator in the reference, and his award shall be binding upon both parties as if he has been appointed by consent.

### Clause 60. INSURNCE

A) Owners guarantee that vessel is entered and shall remain for the duration of this Charter Party in a protection and Indemnity Association, which is a member of the International Group of P & I Clubs.

Owners P & I Club is : North of England.

10

RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
CHARTER PARTY DATED 29TH NOVEMBER, 2005

B) Any additional insurance on vessel and/or cargo levied by reason of the vessel's flag, ownership, class or condition to be borne by Owners.

### Clause 61. CLASSIFICATION

Owners engage themselves to maintain vessel classed NK Register as per line 5 or equivalent during the currency of this Charter. Owners guarantee that the vessel will be insured on a basis, which in respect of collision liability given protection that is considered to embrace at least as much as the Running Down Clause with 4/4 with Hull and Machinery Underwriter.

### Clause 62. BILLS OF LADING

Owners/Master to authorize Charterers or their agent to sign original Bill(s) of Lading and/or seaway Bill(s) if required by Charterers, always to accordance with Mate's receipt in which case the Charterers to indemnify Owners against all consequences or liabilities arising their so signing of Bills of Lading on Owners behalf.

*Letter of Indemnity*

Owners to allow Charterers to discharge cargoes without presentation of original Bill(s) of Lading by providing with L.O.I. in accordance with Owners P & I Club form and wording before discharging. L.O.I. to be signed by Charterers only by an authorized person.

Cargo to be discharged into bonded warehouse/custody of the port and cargo only to be released against original Bills of Lading or receivers L.O.I. signed by first class bank. Any costs for cargo being held in custody of the port to be for Charterers account.

Clause paramount to be incorporated in all Bills of Lading.

Charterers to appear as carriers in all Bills of Lading.

Clause paramount to be incorporated in all Bills of Lading.

Use of any Bills of Lading under this Charter Party is without prejudice to the terms of the Original Charter Party with HANJIN SHIPPING.

### Clause 63. GRAIN REGUALTIONS

A) The Owners guarantee that the vessel is self trimming bulk carrier allowed to load grain or grain products without shifting boards or other fittings for grain. Any expenses resulting from breach of this warranty to be for Owners' account.

B) For the carriage of grain in bulk vessel to have on board at any time of the Charterers period

11

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
## CHARTER PARTY DATED 29TH NOVEMBER, 2005

valid documents and certificates issued by a recognized classification society and certified by National Cargo Bureau.

### Clause 64. PANAMA AND SUEZ

Vessel is fitted for and has necessary equipment and certificates n board to transit Panama Canal (and not restricted due to her load line or bilge radius) and Suez Canal.

### Clause 65. POLLUTION

1) Owners warrant that during the currency of this Charter Party they will comply fully with any rules and/or regulations presently in force and any legislation enacted with respect to pollution by oil or any other substances (including any rules and/or regulations issued there under) issued by any government department or other authorities, and also any similar legislation enforced by any nation of the world, relevant to vessel actual/required trading under this Charter Party.

2) Owners warrant that throughout the currency of this Charter Party they will provide the vessel with valid certificates of financial responsibility for all pollution issued pursuant to (1) Sec. 311 (p) of the U.S. Federal Water Pollution control Act, as amended and (2) any certificates which may be required by U.s. Federal Legislation at any time during the currency of this Charter. Should any delay or detention of the vessel occur then failure by Owners to comply with said acts, laws, rules, regulations, or legislation, or failure to hold the relevant certificates the hire shall cease for the period of such delay or detention, and all extra expenses incurred because of such failure shall be for Owners' account.

### Clause 66.

See Clause 57.

### Clause 67. STOWAWAYS

A)

1. The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in goods and/or containers shipped by the Charterers.

2. If despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods and/or container shipped by the Charterers, this shall amount to breach of Charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines shall be for the Charterers

12

account and the vessel shall remain on hire.

Should the vessel be arrested as a result of the Charterers' breach of Charter according to sub-clause (a) 1. above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release the vessel.

B)

1. If despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expense whatsoever and at howsoever incurred, including fines shall be for Owners account and the vessel shall be off-hire.

2. Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

**Clause 68. WEATHER ROUTING**

Charterers have the right appoint Ocean routes or similar weather routing service to monitor vessel's performance during sea passages. Owns will request Master to co-operate with the appointed weather routing service and follow their recommendations as far as practical. Weather reports to be taken from vessel deck log and/or Ocean Routes or similar weather routing service if so elected by Charterers.

**Clause 69.**

New Both to Blame Collision clause, New Jason Clause and Conwartime 2004 as attached, to be included in this Charter Party and all Bill(s) of Lading shall be subject said clauses.

The U.S.A./Canadian clause Paramount as applicable or the Hague Rules as enacted in the countries other than the U.S.A. and Canada, as applicable, to be incorporate din Bill(s) of Lading.

**Clause 70.**

This Charter Party to be governed and construed in accordance with English Law.

**Clause 71.**

For the purpose of computing hire payments, the time for delivery and redelivery shall be adjusted to G.M.T.

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN CHARTER PARTY DATED 29TH NOVEMBER, 2005

Clause 72. Deleted.

### Clause 73. BIMCO STANDARD ISM CLAUSE FOR VOYAGE AND TIME CHARTER PARTIES

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter party, the Owners' shall procure that both the vessel and 'company' (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Chartereres.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or 'the company' to comply with the ISM Code shall be for Owners' account.

### Clause 74.

Charterers undertake to keep Owners informed during the period as regards the itinerary of the vessel and the names of their agents at ports of call.

### Clause 75.

The Charterers agree that their agents will undertake, without charges, normal ship's husbandry as Owners agents. This shall not include any extra ordinary business, VIZ, dry docking, general average, craw members, in which case Owners shall appoint their own agents or pay Charterers' agents an agency fee in accordance with locally recognised tariff.

Clause 76. Deleted.

Clause 77. Deleted.

### Clause 78.

Charterers to have the option to use bulldozers and similar equipment in the vessel's holds provided weight not exceeding to tank top strength as per vessel's description clause.

### Clause 79.

Charterers have the option to perform hose test at their own expense. In case vessel fails such survey, Owners to rectify the same at their own time and cost and time of subsequent test to be for Owners' account. If required by Charterers crew to assist in sealing vessel's hatches with remneck tape. Ramneck tape to be provided and paid for by Charterers. During sealing of hatches, vessel remains on hire.

14

RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
CHARTER PARTY DATED 29TH NOVEMBER, 2005

### Clause 80. BALLASTING

Vessel to ballast/deballast clean water ballast tanks only including floodable holds, if required by Charterers or their Agents at any time during loading and or discharging, free of expense to Charterers, but in Charterers' time. All ballasting/deballasting shall be at the discretion of master having due regard to stability stresses and seaworthiness of the vessel. Whenever practicable or required by law at the next port of call, the vessel is to replace ballast taken in port or coastal waters with clean seawater ballast. Owners guarantee that the vessel will always be maintained in safe condition during ballast operations. If at any time solid ballast is required all expenses from same, including time sued for loading and discharging such ballast bunkers consumed during such period and time sued for cleaning holds after discharging of such slid ballast, shall be for Charterers account.

The vessel is capable of blasting No. 3 hold, and indeed the vessel normally proceeds to load ports with No. 3 hold in ballast. In such instance Owners, Master and crew will do their utmost to deballast and dry such hold as quickly as possible provided time between discharging port and next loading port is sufficient for its crew to deballast and dry up flooded hold. However, it is understood that time used for such deballasting and drying up of hold No. 3 is not to be considered as off-hire time. Subject to Master's decision considering vessel safety Owners and Master will do their utmost throughout the duration of this Charter to minimize the use of hold No. 3 for ballast purposes.

Owners guarantee vessel always to be safe in ballast.

### Clause 81. BENEFIT OF P & I CLUB/UNDERWRITERS

Charterers to have the full benefit of any lay up and/or return insurance premium received by Owners from Underwriters (as and when received from Underwriters) by reason of the vessel being in port for a minimum period of 30 days provided vessel is on hire.

**Clause 82.** Deleted.

### Clause 83. LIBERTIES

The Owners shall have the liberty to deviate for the purpose of saving life at sea and landing the person(s) saved.

Charterers' option to discharge by vacuvators but same not to exceed permissible strength of upper deck. Which is 3.7 metric tons per square metre, on the port and starboard side of the hatch

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
## CHARTER PARTY DATED 29TH NOVEMBER, 2005

coamings.

Charterers have the right of placing stevedores on deck together with their cooking utensils if required and vessel to supply them for Charterers' account daily with their requirements of fresh water for washing, cooking and drinking purposes. Cost of fresh water supply to be directly negotiated with Master and subject to Master's discretion and prior consent.

Owners and Master also undertake best efforts to co-operate with Charterers for the best stowage of cargo.

Owners and Master also undertake co-operation with Charterers in taking necessary steps for cargo fumigation, if necessary, at Charterers' time and expense.

### Clause 84. VESSEL APPEARANCE
Throughout the duration of this charter, Owners to maintain the vessel's exterior hull, accommodation block, main deck, hatches and hatch covers in a clean and well painted condition. Furthermore, all Plimsoll and draft marks are to be clearly marked and readable at all times.

### Clause 85. AZOV SEA CLAUSE
Deleted.

### Clause 86. Deleted.

### Clause 87. Deleted.

### Clause 88. BUNKERING PRIVILEGES
Owners certify that the vessel is and will remain so throughout the duration of this Charter, eligible for full bunkering privileges in the United States of America and its territories and possessions, under all present and future United States Laws and/or regulations and is not, nor will be restricted, as to bunkering at any other countries or ports of call during this Charter.

### Clause 89. ADDITIONAL EQUIPMENT AND FITTINGS
The Charterers, subject to the Owners and/or Master's prior consent shall be at liberty to fit/weld any additional equipment and fittings for loading discharging and/or securing cargo. Such work shall be done at the Charterers' risks/expenses and time and the Charterers shall remove such equipment and fittings at their risk/expense prior to redelivery if so required by the Owners.

16

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN CHARTER PARTY DATED 29TH NOVEMBER, 2005

Any resulting damages to vessel such as paint to be corrected by Charterers.

### Clause 90. PERFORMING SPEED

The Charterers to have the privilege of slow steaming and/or speeds the vessel.

Owners to supply to Charterers details of expected fuel consumption at the reduced speed or speeds required.  Such estimated being in good faith.

### Clause 91. FITTINGS

The Charteers, subject to Owners prior approval which not to be unreasonably withheld, shall be at liberty to fit/weld any additional equipment and fittings from loading, discharging and/or securing cargo always at class/Master's satisfaction or approval.  Such work shall be done at the Charterers risk/expense and time prior to redelivery, if Owners so request.

The meaning of this Clause shall include the cutting/re-welding of cement loading holes as required by shippers at Charterers risk/time and expense.

### Clause 92.

Charterers agents at various ports of call will attend to routine Owners matters without agency fee as far as is customary and agency fees and tariffs permit, and Charterers can deduct any outlays including attendance fee, expenses, and cash disbursements to Master form subsequent hire payments, however if any exceptional circumstances (including but not limited to crew desertion, general average, repairs and surveys) Owners are to appoint their own agents at the port of loading/discharging.

### Clause 93. BIMCO ISPS CLAUSE FOR TIME CHARTER PARTIES

(a)(i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) or any local law, legislation or regulation of the flag of the vessel or places called at by the vessel (all referred to hereafter jointly as "THE ISPS CODE")in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers.

The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

17

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN CHARTER PARTY DATED 29TH NOVEMBER, 2005

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)(i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision :
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

### Clause 94.

Throughout the Charter period Owners, whenever the passage of time, wear and tear or any event required steps to be taken to maintain or restore the vessel to conditions stipulated in this Charter, shall exercise due diligence so to maintain or restore the vessel.

### Clause 95.

A. Owners warrant that the vessel's cargo holds are in good condition, and will be so maintained throughout the Charter period. Good condition shall mean the vessel cargo holds are so well

18

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
## CHARTER PARTY DATED 29TH NOVEMBER, 2005

painted and free from loose ruse, loose paint and loose scale and suitable in all respects to carry any permitted cargo including grain and other cargoes requiring high hold cleanliness standards.

B. If Owners are in breach of their obligation under this Clause Charterers may so notify Owners in writing, and if, after the expiry of 30 (thirty) days following the receipt by Owners of any such notice, Owners have failed to demonstrate the exercise of the diligence to Charterers' reasonable satisfaction as required in this Clause the vessel shall be off-hire and no further hire payment shall be due, until Owners have so demonstrated that they are exercising due diligence. Furthermore, at any time whiles the vessel is off-hire under this clause Charterers have the option to terminate this Charter by Owners or from any later date stated in such notice provided vessel is free of cargo. The sub-clause is without any prejudice to any rights of Charterers or obligations of Owners under this Charter or otherwise.

### Clause 96.

Vessel to be in possession of a valid deratisation or exemption certificate throughout the duration of the Charter Party.

### Clause 97. LIGHTENING AND TOP OFF

The vessel shall carry out lightening and top-off operations by arriving in the open operation areas with her holds ready to be lightened/topped off, weather permitting, shall assist by having her crew take and/or pass mooring ropes required by the Master of the lightening/top-off vessel, both for mooring/unmooring of the ocean vessel alongside it. While alongside the vessel is to carefully tend to all mooring and frequently verify her draft. Furthermore the Master shall at all times co-operate fully with Charterers and/or their agents to expedite the transfer of cargo and the vessel shall maintain a draft when feasible, as requested by the Master of the lightening/top-off operations, however, vessel to provide free of charge any feeders that may be on board, otherwise Charterers to provide fenders to Master's satisfaction. The area used for lightening/top off operation is to be customary and usual area where such operations normally take place and safe in all respects for the vessel.

### Clause 98.

Vessel's accommodation and pilot ladders as well as hold ladders and access thereto are to be kept in good repair so as to comply with the safety requirements at all ports of call. Any delays to vessel and/or her operations as a result of non-compliance with this Clause to be considered as off hire and any expenses incurred to be for Owners account.

### Clause 99.

19

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN CHARTER PARTY DATED 29TH NOVEMBER, 2005

If circumstances applicable to any of the excluded areas or ports stipulated in line 34 should alter in such a manner so as to enable or permit the vessel to trade thereto, Owners sand Charterers shall mutually discuss the effect of such changes with a view to reinstatement of the areas of ports concerned for permissible trading under this Charter Party. Permission for reinstatement shall not be unreasonably withheld by Owners and shall not affect the already agreed rate of hire.

### Clause 100.

The vessel's tank tops are adequately protected against damages likely to be incurred in the carriage of heavy and/or bulk cargoes. The Charterers shall not be liable for any damage in loading and discharging bulk cargo if such damage results from ordinary wear and tear. Charterers to have the privilege of using bulldozers in vessel's holds.

Owners warrant that the vessel has sufficient stability and safe trim when homogeneously loaded to full cubic and deadweight capacity, always subject to condition of ballast, bunkers, fresh water etc.

Owners guarantee that the vessel's holds, hatches, tanks, valves and pipelines are weather tight at the commencement of this Charter, and Owners bind themselves to take very possible precaution to maintain the holds, hatches, tanks, valves and pipelines in this conditions during the Charter period.

Owners warrant that the vessel and all her capacities as described in this Charter will be maintained throughout the duration of this Charter. Furthermore Owners undertake that, throughout the period of service under this Charter, they will whenever the passage of time, war and tear or any event requires, maintain the vessel as stipulated on the pact of this Charter Party and this Clause.

### Clause 101.

Prior redelivery Owners allowed to bunker vessel for their account without interfering with vessel's operations. Charterers to be informed accordingly.

### Clause 102.

If finished steel products to be loaded, pre-loading survey to be held for Owners P & I Club purposes and cost to be shared 50/50 between owners and Charterers. If semi finished steel Charterers to give Owners 2 working days notice.

### Clause 103. Deleted.

### Clause 104.

All negotiation and eventual fixture to be kept private and confidential.

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN CHARTER PARTY DATED 29TH NOVEMBER, 2005

#### Clause 105.

In the event of breakdown of cranes by reason of disablement or insufficient power or otherwise, the hire to be reduced pro-rata for the period of such an insufficiency in proportion to the number of cranes that were available at the time of breakdown of equipment.

If Charterers elect to continue work on hatch or hatches affected by breakdown of vessel's cranes by hiring shore appliances, Owners are to pay for shore appliances, but in such case Charterers are to pay full hire for all time shore appliances are working.

Any stevedoring and/or labour charges additionally accruing due to breakdown of vessel's equipment including costs for standby of stevedore labour to be for Owners' account. Charterers to endeavour to keep costs as low as possible.

#### Clause 106. Deleted.

#### Clause 107.

BIMCO U.S. Security Clause and BIMCO U.S. Customs advance notification/AMS Clause for time Charter Parties to be incorporated in this Charter Party.

(A) If the vessel loads or carries cargo destined for the U.S. or passing through U.S. ports in transit, the Charterers shall comply with the current U.S. Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense :

    i)          Have in place a SCAC (Standard Carrier Alpha Code) ;

    ii)        Have in place an ICB (International Carrier Bond) ;

    iii)     Provide the Owners with a timely confirmation of i) and ii) above ; and

    iv)    Submit a cargo declaration by AMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(B) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the vessel shall remain on hire.

(C) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are

21

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
## CHARTER PARTY DATED 29TH NOVEMBER, 2005

the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(D) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, law or regulation.

### Clause 108.
Owners guarantee vessel's hatch covers are to be watertight all throughout this Charter period and if any hatch cover found defective same to be rectified at Owners' time and expenses to Charterers satisfaction, Charterers also have the right to carry out hose test on all hatches at any time during this Charter Party.

### Clause 109.
Owners guarantee that vessel can load up to full dead weight capacity provided stowage factor of cargo permits and provided no restrictions at loading and discharging ports.  Always subject Master's discretion.

### Clause 110.
Owners warrant that vessel's holds are clear of any fittings/superstructures, such as car deck/ curtain plates, whatsoever.

### Clause 111.
Charterers' option of welding padeyes except on fuel tank tops and hoppers and at Master's reasonable satisfaction, at their own arrangement and expense and Charterers to remove all padeyes before redelivery at Master's reasonable satisfaction, but Charterers' option to redeliver vessel without removing padeyes paying USD10 per padeye.

### Clause 112.
Owners guarantee that vessel is not black listed by any Arab league countries.   Vessel is not black listed by US/Canadian Longshoremen's Union.

### Clause 113.
BIMCO War Risk Clauses for Time Charter 2004 to be apply.

### Clause 114.

22

### RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
### CHARTER PARTY DATED 29TH NOVEMBER, 2005

Owners guarantee that vessel is suitable for world wide trading including Australia/New Zealand/Japan/USA/Canada with AHL in good order.

Vessel not ITF but trading Australia all the time.

Checking and reverting on WWF.

#### Clause 115.

Vessel have to comply with all regulations/requirements at port of call. Furthermore Owners guarantee that vessel is free of any Asian Gypsy Moth eggs or larvae any form of Asian Gypsy Life. Owners guarantee that vessel not called in Russian Far East area from Posyet to Olgabay including Vladivostok, Nakhodka and Vostochiny during last two years.

Any delay caused by non-compliance with the aforesaid, vessel will be placed off-hire and expenses incurred direct to vessel resulting from such delay including bunkers consumed during that period will be for Owners account.

#### Clause 116.

Owners guarantee that vessel is fully fitted logger with collapsible steel stanchions + sufficient lashing materials for full cargo of logs under/on decks.

–    E    N    D    –

## NEW BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the Laws of the United States of America, the following Clause shall apply :

23

RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
CHARTER PARTY DATED 29TH NOVEMBER, 2005

## BOTH-TO-BALME COLLISON CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and
any act, neglect or default of the Master, Mariner, Pilot or the Servants of the Carrier in the
navigation or in the management of the ship, the Owners of the goods carried hereunder will
indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in
so far as such loss or liability represents loss of or damage to or any claim whatsoever of the
Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the
Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or
her Owners as part of their claim against the carrying ship or Carrier."

The foregoing provisions shall also apply where the Owners, operators or those in charge of any
ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in
respect to a collision or contact.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall
contain the same Clause.

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after commencement of the voyage
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the
consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods,
Shippers, consignees, or Owners of the goods shall contribute with the Carrier in General Average
to the payment of any sacrifices, losses, or expenses of a General Average nature that may be
made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

24

If a salving ships is owned or operated by the Carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the Carrier or his Agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, consignees or Owners of the goods to the Carrier before delivery.

## WAR RISKS CLAUSES

(1) No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the ship has been ordered to discharge either on signing Bills of Lading or thereafter be one to which the ship is or shall be prohibited from going by the Government of the Nation under whose flag the ships sails or by any other Government, the Owners shall discharge the cargo at any other port covered by this Charter Party as ordered by the Charterers (provided such other port is not a blockaded or prohibited port a above mentioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered.

(2) The Ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the Government of the Nation under whose flag the vessel sails or any department thereof, or any person acting or purposing to act with the authority of such Government or of any department thereof, or by any committee or persons having, under the terms of the War Risks Insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfillment of the contract voyage and the freight shall be payable accordingly.

## WAR RISKS CLAUSE FOR TIME CHARTER, 2004 (CODE NAME : CONWARTIME 2004)

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

25

### RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
### CHARTER PARTY DATED 29TH NOVEMBER, 2005

(ii) "War Risks" shall include any actual, threatened or reported:

war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

26

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
## CHARTER PARTY DATED 29TH NOVEMBER, 2005

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-

   (i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

   (ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

   (iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

   (iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

   (v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers

27

## RIDER CLAUSES TO M.V. "FALCON TRADER"/HANJIN
## CHARTER PARTY DATED 29TH NOVEMBER, 2005

within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h)  If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

Exhibit 2-1

**Claire Andrews**

| | |
|---|---|
| **From:** | HA YOUNG JOON [yjha@hanjin.co.kr] |
| **Sent:** | 02 March 2007 09:37 |
| **To:** | Iris Shiu |
| **Subject:** | Falcon Trader |

To:     Owners and their agents and managers.
From:   Hanjin
Re:     Delivery of cargo carried on board m.v. FALCON TRADER at
Newport, Cardiff and Immingham
BILL OF LADING NO HJTCO61205NEWO1 - cargo thereunder.

We hereby request owners to give delivery of the above cargo to Eurosteel Products Limited (who are the notify party named in our "house" bills of lading) and not to Avonmouth Docks Bristol (who are the consignees named in the above-numbered Hanjin Transportation Company Limited master bills of lading, the originals of which have been surrendered to owners' P&I Club's correspondents in South Korea, Hyopsung Inchon), and in consideration of your giving delivery of the said cargo to the said Eurosteel Products Limited (notwithstanding the existence of the second sets of "house" bills of lading) we hereby undertake to indemnify you and hold you harmless in respect of all losses, liabilities, costs and expenses of any whatsoever arising out of the delivery and/or delay in delivery of the said cargo.

(This undertaking is governed by English law and by the non-exclusive jurisdiction of the English courts).

. ours faithfully,

Hanjin Transportation Limited.

1

**Claire Andrews**

| | |
|---|---|
| **From:** | HA YOUNG JOON [yjha@hanjin.co.kr] |
| **Sent:** | 05 March 2007 23:32 |
| **To:** | Claire Andrews |
| **Cc:** | Iris Shiu |
| **Subject:** | RE: Falcon Trader - Immingham cargo |

To:    Owners and their agents and managers.

From:   Hanjin

Re:    Delivery of cargo carried on board m.v. FALCON TRADER at Immingham

BILL OF LADING NOs HJTCO611301MM001 - cargo thereunder.

We hereby request owners to give delivery of the above cargo to Thyssenkrupp (who are the notify party named in our "house" bills of lading) and not to Carlbom (who are the consignees named in the above-numbered Hanjin Transportation Company Limited master bills of lading, the originals of which have been surrendered to owners' P&I Club's correspondents in South Korea, Hyopsung Inchon), and in consideration of your giving delivery of the said ¬argo to the said Thyssenkrupp (notwithstanding the existence of the second sets "house" bills of lading) we hereby ¬ndertake to indemnify you and hold you harmless in respect of all losses, liabilities, costs and expenses of any whatsoever arising out of the delivery and/or delay in delivery of the said cargo. (This undertaking is governed by English law and by the non-exclusive jurisdiction of the English courts).

Best regards
y.j.ha

1

*Exhibit 3*

# CORY BROTHERS SHIPPING AGENCY LTD



Accounts Dept.
Cory House
21 Berth Tilbury Docks  Tilbury  Essex  RM18 7JT
Telephone:  01375 843461
Facsimile:  01375 842124

**VAT Registration No.**        503 2955 65

To:

The North of England Protecting & Indemnity Association Ltd
The Quayside
Newcastle Upon Tyne
NE1 3DU

| **INVOICE NOTE** | **DAAS 0110965** |
|---|---|

| Issuing Office: | Newport Office |
|---|---|
| Address: | Alexandra Dock |
|  | Newport |
|  | South Wales, NP20 2NP |

| Telephone: | 01633 266351 |
|---|---|
| Fax: | 01633 256915 |
| E-Mail: | corynewport@cory.co.u |

Customer VAT Registration No.                    **Contact Name:**            Liz William

| Invoice Date / Tax Point | Customer Account No. | Job File Reference | Your Reference | COST Excluding VAT | VAT Rate Code | VAT |
|---|---|---|---|---|---|---|
| 16-Apr-2007 | 2001136 | Daa 7035063 | "Falcon Trader" | | | |
| | | | | **STERLING** | | **STERLING** |

To:

### m.v."Falcon Trader" - provision of personnel to watch over steel coils

Professional services rendered in connection with attendance at Newport Docks and
Cardiff Docks, South Wales, to provide a security watch over steel coils discharged
from the vessel "Falcon Trader"

| | | | | | | |
|---|---|---|---|---|---|---|
| 14 man days at £450 per man per day | | | | £5,400.00 | | |

**Expenses**

| | | | | | | |
|---|---|---|---|---|---|---|
| Mileage to/from Bristol area: 517 miles @ £0.50 per mile | | | | £258.50 | | |
| Severn Bridge Tolls: 12 x £5.10 | | | | £61.20 | | |
| DHL Courier | | | | £17.00 | | |
| Special Delivery via Post Office | | | | £4.10 | | |
| ncy Fee | | | | £1,000.00 | | |

**Attn : Claire Andrews**

| Posting Analysis: | | STERLING |
|---|---|---|
| | | |
| | | |
| | | |
| TOTAL | STERLING | 0.00 |

| | |
|---|---|
| £6,740.80 | 0.00 |
| **Total Credit Value Sterling** | **£6,740.80** |

VAT Rate Codes Analysis
1 Zero
Zero Exempt
1 Exempt
15 Outside of Scope
6 Standard

Registered in England, Registration Number: 4717201   Registered Office: Cory House , 21 Berth Tilbury Docks, Tilbury, Essex  RM18 7JT
Bankers: The Royal Bank of Scotland plc, Shipping Business Centre, 5-10 Great Tower Street, London EC3P 3HK  Sort Code: 16-01-01  Sterling Account Number: 50035275  IBAN  GB48RBOS16010150026275

# land & Turner Ltd

*L MARINE SURVEYORS & CONSULTANTS*

**ROAD, HULL. HU9 1RA.**
. 298569  Fax: +44 (0) 1482 227001
·mcauslands.com
·ncauslands.com

*Exhibit 4-*

**INVOICE**

f the "FALCON TRADER"
· e of England P&I Association Ltd
The Quayside
Newcastle Upon Tyne
NE1 3DU
UK

| | |
|---|---|
| Your Ref: Iris Shiu | |
| **Invoice No.** | 038007 |
| **Invoice/Tax Date** | 21/03/07 |
| **Our Ref** | 07/231 |

**M.V."FALCON TRADER"** Out-turn Survey of Steel Products
**At Immingham - 1ˢᵗ March 2007**

Attendance at the vessel prior to the commencement of discharge on the 1ˢᵗ March 2007. Meeting with the vessel's Master and Chief Officer and informing them of our duties and responsibilities. Sighting all cargo before discharge and noting its condition. Thereafter attending at the vessel during the following periods:

| Date | Hours |
|---|---|
| 1ˢᵗ March 2007 | 0600 – 1800 hours |
| 2ⁿᵈ March 2007 | 0600 – 1800 hours |
| 3ʳᵈ March 2007 | 0600 – 1800 hours |
| 4ᵗʰ March 2007 | 0600 – 1800 hours |
| 5ᵗʰ March 2007 | 0600 – 1800 hours |

RECEIVED

Reporting – 4 hours

| Total | 21 hours |
|---|---|

Expenses to and at Immingham, photography and reporting.

| Bank Name: | Barclays Bank Plc |
|---|---|
| Address: | 32 Paragon Square |
| | Hull, HU1 3QU, ENGLAND |
| Account: | 20636312 |
| Code: | 20-43-47 |
| IBAN No.: | GB34BARC20434720636312 |
| Swift Code: | BARC GB 22 |
| Account Name: | McAusland & Turner Ltd. |

| | |
|---|---|
| **Net** | £1,829.00 |
| **VAT** | £0.00 |
| **Gross** | £1,829.00 |

**VAT No: GB 168 7194 22**

# McAusland & Turner Ltd

Ex. 4-2

*INTERNATIONAL MARINE SURVEYORS & CONSULTANTS*

**433 HEDON ROAD, HULL. HU9 1RA.**
Tel. +44 (0) 8701 298569   Fax: +44 (0) 1482 227001
Email: accounts@mcauslands.com
Web Page: www.mcauslands.com

RECEIVED

**INVOICE**

| | |
|---|---|
| The Owners "FALCON TRADER"<br>C/o The North of England Protecting &<br>Indemnity Association Ltd.<br>The Quayside<br>Newcastle Upon Tyne<br>NE1 3DU | Your Ref: 2006/3/IS/CLA |

| Invoice No. | 038707 |
|---|---|
| **Invoice/Tax Date** | 22/03/07 |
| **Our Ref** | 07/256 |

**M.V."FALCON TRADER"  Appointment as Protecting Agents
At Immingham 5th March 2007**

**5th March 2007  to 8th March 2007**
Representing Owners as Protecting Agents at Immingham. Discussions with Railfreight at Immingham regarding the receipt of the cargo and it being withheld from Receivers. Discussions with Railfreight on a daily basis regarding the position of the cargo. Discussions with Lockwood Shipping regarding receipt of Bill of Lading. Meeting with Lockwood Shipping and obtaining a copy of the Bill of Lading and forwarding to Owners. Receiving instructions for the release of the cargo and advising Lockwood Shipping.

| | | | |
|---|---|---|---|
| Bank Name: | Barclays Bank Plc | **Net** | £1,427.00 |
| Address: | 32 Paragon Square | | |
| | Hull, HU1 3QU, ENGLAND | | |
| Account: | 20636312 | **VAT** | £0.00 |
| Code: | 20-43-47 | | |
| IBAN No.: | GB34BARC20434720636312 | | |
| Swift Code: | BARC GB 22 | **Gross** | £1,427.00 |
| Account Name: | McAusland & Turner Ltd. | | |

**VAT No: GB 168 7194 22**

Exhibit 5



RAYFIELD.

3 Collingwood Street
Newcastle upon Tyne
NE1 1JW

Tel: +44 (0) 191 261 2333
Fax: +44 (0) 191 261 2444
24 hour mobile: +44 (0) 771 000 5171

Email: law@rayfield-mills.co.uk
www.rayfield-mills.co.uk

World Reach Shipping Ltd, Monrovia
c/o North of England P&I Association Limited
100 The Quayside
Newcastle upon Tyne
NE1 3DU
**Fao: Claire Andrews**

| | |
|---|---|
| Date: | 20 March 2007 |
| Your ref: | 06/003/IS |
| Our ref: | SCM/N11315 |

INVOICE NUMBER:     6 5 5 7

re: **FALCON TRADER**
Dispute with Hanjin and cargo receivers re: duplicate bs/l

VAT REGISTRATION NUMBER
GB 621 078 466

| PROFESSIONAL SERVICES | COSTS | DISBURSEMENTS | VAT CODE | VAT | TOTAL |
|---|---|---|---|---|---|
| To our professional charges whilst acting in the above matter. | £1,273.00 | | o/s | Nil | £1,273.00 |
| **TOTALS** | £1,273.00 | | o/s | Nil | £1,273.00 |

| VAT Code: | | Less in hand | |
|---|---|---|---|
| % - Taxable | | | |
| Z  - Zero rate and exempt | | Net Balance Due | £1,273.00 |
| OS - Outside Scope | | | |

The amount shown due is now a copy of this invoice. ... of your right ... he Solicitors Business) '94 in respect w/s only, and not exceed s within one of hereof to certificate ting that in their opinion the costs charged are fair and reasonable or, as the case may be, what lesser sum would be fair and reasonable. If you require us to obtain a remuneration certificate, you must pay to us the paid disbursements and VAT comprised in the bill together with 50% of the costs unless the amount required has already been paid by deduction or otherwise, but (unless we have agreed to do so) the Council of the Law Society may waive all or part of these requirements if satisfied from your written application that exceptional circumstances exist to justify granting a waiver. Also there are provisions in section 70, 71 and 72 of the Solicitors Act 1974 relating to taxation of costs in both non-contentious and contentious matters which give you the right to have the bill checked by an officer of the High Court (although this is subject to certain limitations). In any non-contentious matter (where the whole of the bill has not been paid by deduction or otherwise) we may charge interest on the outstanding amount of the bill in accordance with article 14 of the said Order. If in any contentious matter, pursuant to an order in your favour for costs and disbursements to be paid by another party, such costs and disbursements are taxed, any interest for the period between judgment and the taxing masters certificate which is recovered on costs and disbursements (which costs and disbursements have not been paid prior to taxation) shall belong to us except to the extent, in the case of disbursements, that such interest is due to the person or persons to whom the disbursements are ultimately paid.

X:\Humphrey\SCM   -   Bills\FALCON TRADER N11315.doc

Rayfield   Stephen Mills   Stephen Ravenscroft   Nicola Jeanes   Elizabeth Davis   Peter Sim   Stephen Main   Joanne Clark

Exhibit 6

# Statement

## North of England P&I

| Your Ref | Our Ref | Vessel | Inv. No | Date | Amount |
|----------|---------|--------|---------|------|--------|
| 2006/3/CLA | 2618 | Falcon Trader | 20/2007 | 16/04/2007 | £8,496.30 |
| | | | | Total | £8,496.30 |

Exhibit 7



# GUARANTEE LETTER

Date : 14th, DEC, 2006

To: MASTER OF M/V " FALCON TRADER"

Fm: Hanjin Transportation Co.,LTD, KOREA

**Subject:** ***RESPONSIBILITY FOR CARGO DAMAGE***

Dear Sirs,

Ship: M/V " FALCON TRADER"

Voyage: Port of Loading    : NANTONG , CHINA

Cargo  : WIRE RODS

The above-mentioned goods were shipped on MV FALCON TRADER by Messrs, Hanjin Transportation Co.,Ltd, Korea and completed loading will finish on 14th DEC, 2006 at the port of NANTONG, CHINA.

we, Hanjin transportation co.,ltd, Korea as Charterers bear the responsibility for wire rods damage cause that loading excessive height of cargo stowed in hold No.1.

Yours faithfully,

For and on behalf of

Hanjin Transportation Co.,Ltd., Korea